IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

NOAH K. WHITT,

       Plaintiff,

v.                                        Civil Action No. 5:04-CV-76

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
       Defendant.

**MEMORANDUM, OPINION AND REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

### I. Introduction

A.    Background

Plaintiff, Noah K. Whitt, (Claimant), filed his Complaint on July 7, 2004, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed her Answer on September 7, 2004.[2] Claimant filed his Motion for Summary Judgment on October 7, 2004.[3] Commissioner filed her Motion for Summary Judgment on November 8, 2004.[4]

B.    The Pleadings

        1.    Claimant's Motion for Summary Judgment.[5]

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 6.

[4] Docket No. 7.

[5] Docket No. 6.

2. Commissioner's Motion for Summary Judgment.[6]

C. Recommendation

1. I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED. The ALJ's decision was based on substantial evidence. The ALJ properly followed SSR 87-6 and properly found that Claimant did not meet Listings 11.02 and 11.03. Also, the hypothetical questions posed to the VE were based on Claimant's functional limitations as supported by objective medical evidence.

## II. Facts

A. Procedural History

On September 25, 2002 Claimant filed for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) alleging disability since June 6, 2002. The application was denied initially and on reconsideration. A hearing was held on December 9, 2003 before an Administrative Law Judge (ALJ). The ALJ's decision dated March 11, 2004 denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on June 4, 2004. This action was filed and proceeded as set forth above.

B. Personal History

Claimant was 43 years old on the date of the December 9, 2003 hearing before the ALJ. Claimant has the equivalent of a high school education and past relevant work experience as a courtesy patrol driver and floor maintenance laborer.

C. Medical History

---

[6] Docket No. 7.

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability June 6, 2002 - December 9, 2003:

**Reynolds Memorial Hospital** , Tr., pp. 144-146, October 5, 2001, Emergency Room Record
- 41-year old white male complains of congestion in the chest and nose and notes some inspiratory pain, onset approximately three days ago. Also complains of some maxillary pain for about one week. No otalgia. Has mild sore throat and mild odynophagia.
- Diagnosis: Viral, upper respiratory nonspecific viral syndrome.

**Ohio Valley Medical Center**, Tr., p. 147, December 24, 2001, Emergency Trauma Record
- 41-year old white male comes to the emergency room complaining of a burn to the top of his right hand. Accidentally burned his hand with a hot sludge that came out of a radiator.
- Diagnosis: First degree burn of the right hand.

**Reynolds Memorial Hospital**, Tr., pp. 148-150, April 19, 2002, Emergency Room Record
- The mediastinum and heart are normal. The lungs are clear. There is no change from December 31, 2001.
- General Diagnosis: Left rib pain.

**Reynolds Memorial Hospital**, Tr., pp. 151-152, December 31, 2001, Emergency Room Record
- The mediastinum and heart are normal. There is a chronic granuloma at the left base. The lungs are clear. No active pulmonary disease.

**Ohio Valley Medical Center**, Tr., pp. 153-158, June 7, 2002, Emergency Trauma Record
- Chief Complaint: Numbness, right arm and leg.
- Assessment: Acute right sided numbness.
- Disposition: Discharge against medical advice. Normal CT Scan of the head.
- Impression: No acute or active process. Left based nodule could be due to a calcified granule.

**Reynolds Memorial Hospital**, Tr., pp. 151, August 13, 2002
- 42-year old right handed man who had several episodes of disorientation and suspected to have possible seizures. He was started on Dilantin, 100 mg three times a day prior to this; Electroencephalogram findings: the awake background consists of medium voltage alpha rhythm of 8 to 9 herds; eye-opening produced symmetrical attenuation of background activity. Hyperventilation was carried out and produced no abnormalities. Photic simulation elicited bilateral symmetrical occipital driving. The patient was drowsy, but did not sleep. Questionable epileptiform discharges were seen in the right anterior and mid temporal area. Findings support the diagnosis of partial epilepsy.

**Department of Radiology, Reynolds Memorial Hospital**, Tr. p. 164, August 12, 2002
- MRI of the brain: Impression: Small area of abnormal signal in the internal capsule as described. This may be related to previous trauma. An old embolic incident would be

less likely.

**Reynolds Memorial Hospital**, Tr., p. 167, June 25, 2002, CT of the Head
- Ventricles are normal size and shape, pineal and choroid plexus are calcified without shift. There are no abnormal masses, densities or areas of enhancement. The vessels visualized by the circle of willis appear unremarkable.
- Impression: Negative.

**Reynolds Memorial Hospital**, Tr., p. 168, June 14, 2002
- Mild plaque both carotid bulbs mild intimal thickening both common carotid arteries. Proximal common carotid artery hemodynamic stenosis in the 40-59% range. No significant plaque identified.
- Patent internal carotid arteries bilaterally. Patent vertebral arteries bilaterally with antegrade flow.

**Dr. Romeo B. Tan**, Tr., p. 170-181, April 11, 2001 - October 14, 2002
- Medications: Cozaar 50 mg qd and Asat qd.

**Dr. Thomas J. Schmitt, Internal Medicine Consultant of Examination**
Tr., p. 182-187, December 18, 2002
- Patient has a six month history of seizures. He suffered a head injury at some time in the past. He describes his seizures as occurring two to three times a months. They are accompanied by loss of consciousness and are major motor in nature. He also experiences lethargy and dizziness as a post ictal phemenon. No history of laceration, fracture or tongue biting. Current Medications: Cozaar 50 mg qd; Phenytoin Ex 100 mg tid; and Tegretol 300 mg tid;
- Impression: Seizure disorder without remarkable findings on neurological examination.

Tr., pp. 188-196, Residual Functional Capacity Assessment, December 27, 2002
- Seizures, epilepsy, occasional limitation to claiming, frequent limitation to balancing, stooping, kneeling, crouching and crawling. Unlimited environmental limitations.

**Dr. Ashraf Badour, M.D.**, Tr., pp. 197-216, August 6, 2002 - May 29, 2003
- Notes are illegible.

Tr. pp. 217-225, Residual Functional Capacity Assessment, June 9, 2003
- Avoid concentrated exposure to hazards. Normal speech, hearing gait. Last seizure: April 18, 2003.

**Dr. Ashraf Badour, M.D.**, Tr., pp. 230-237, July 16, 2003 - October 28, 2003
- Epilepsy, major motor seizures, seizures occurring more frequently than once a month, in spite of at least three months of prescribed treatment. Daytime episodes: this has lasted at least twelve (12) months. The awake background consists of a medium voltage alpha rhythm to 8 to 9 herds. Eye-opening produced symmetrical attenuation of background

activity.  Hyperventilation was carried out and produced no abnormalities.  Photic stimulation elicited bilateral symmetrical occipital driving.  The patient was drowsy, but no sleep was obtained.  Questionable: epileptiform discharges were seen in the right anterior and mid-temporal area.
- Interpretation: Abnormal electroencephalogram recording due to the presence of epileptiform discharges in the right anterior and mid temporal area.  Previous electroencephalogram finding support the diagnosis of partial epilepsy.

D.     Testimonial Evidence

### 1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr.524-28, 530, 539-44, 547-49):

> Q     Yeah.  What happened around June of last year?
>
> A     I had a seizure during work.
>
> Q     And was that the first time you'd had a seizure?
>
> A     Yes, sir.
>
> *           *           *
>
> Q     How often do you still have seizures?
>
> A     It varies.  There was one time I had five during a month, and then another time I might have one.  It depends on what I'm doing at the time more or less.
>
> Q     What kinds of things does it depend on, I mean?
>
> A     I get like too much exercise, or if I climb the hill where I live, or just walk very far.
>
> Q     If you just sit at home can you kind of control the seizures?
>
> A     Sometimes I can, sometimes I can't.
>
> Q     You mean sometimes they happen anyway?

A Yeah.

Q What are the seizures like?

A Well, I don't really know what happens during them myself, but I know I pass out. And when I wake up I don't have any memory of anything happening.

Q Do you know how long they last?

A No, I don't know that.

Q But I mean have people told you?

A My wife's told me. I think the longest one was a half an hour.

Q And what - - have the people told you what happens during the seizures?

A I more or less just pass out cold.

Q Do you fall to the ground?

A If I'm standing, yeah.

Q Okay. And then does your body shake?

A No.

Q Or lose bowel or bladder control?

A No, I don't do any of that.

     *  *  *

Q Do you have any side effects from these medicines?

A I'm not allowed to go out in the sun. More or less just like I'm high or wasted most of the time.

Q Okay. Have any of your doctors told you anything you should avoid doing because of this condition?

A       Just no driving. Don't get too strenuous. Basically no working, no heavy lifting.

Q       Have they said you could do like a lighter job or an easier job?

A       He just tells me no work at all.

Q       Who's that?

A       Dr. Badore.

Q       When was your last seizure?

A       Couple of weeks ago, I believe.

Q       And it was the same kind? You pass out for awhile?

A       Yeah.

Q       Okay. And do you remember how long it lasted, or anybody tell you how long it lasted?

A       Nobody told me.

Q       Do you get any kind of warning of these seizures?

A       My wife says that my eyes start to close, just kind of squinting most of the time.

Q       But do you feel a warning coming on or anything?

A       No, I don't. No.

Q       No.

A       Except for dizziness if I stand up. That's about the only thing I feel.

Q       Yeah, what I mean is, if you get a warning are you able to sit down before the seizure comes on or something, so that you don't hurt yourself or - -

A       Not that I know of. I've never asked anybody that.

Q       Now is there anything that causes these seizures to come on?

A	Just more or less they come on at any time.

Q	No, I mean is there anything that caused the first one? You know, does anything cause them to start?

A	I have no idea.

Q	Were you ever hit in the head or anything like that?

A	Well, according to Dr. Badore, it's an old head injury that's causing it now.

Q	Do you have any idea what that is?

A	I've had all kinds of head injuries during my life.

Q	Oh.

A	I was a pretty rough kid.

*	*	*

### 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 552-55):

Q	Okay. Let me give you a hypothetical question. If we assume a person of the same age, education, and work experience as the Claimant. But assume a person who's able to – has no exertional impairments. But there'd be no workplace hazards like heights or dangerous moving machinery or moving - - or knives. No ladders, ropes, or scaffolds. No more than occasional work on stairs or ramps. No more than occasional balance, stoop, kneel, crouch, or crawl. Would there be any - - would such a person be able to do any of the past jobs? Either of the two past jobs you've - - and no driving.

A	No, Your Honor. He would not be able to [INAUDIBLE] driving in the courtesy

[INAUDIBLE].

Q   Yeah.

A   The janitor, there's exposure to hazardous machinery.

Q   Yeah.

A   And it's also the same - - well, the three hour a day job wouldn't be substantial, gainful - -

Q   Yeah. What - - would there be other jobs such a person could do at the medium, or light, or sedentary levels?

A   At the medium level there are hand packers, Your Honor. 400 local, 118,000 nation. There are also laundry workers, 210 local, 49,000 nation. Three are drycleaner helpers, 120 local, 20,000 nation. And there are baggers, 1,700 local, 700,000 nation. These are medium jobs, Your Honor.

Q   Yeah. Would there be any light jobs that would - -

A   Yes. At the light level there are laundry folders, 300 local, 48,000 nation. There are labelers and markers, 300 local, 64,000 nation. Inspector checkers, 800 local, 111,000 nation.

Q   Would there be any sedentary jobs?

A   There are surveillance system monitors, 50 local, 15,000 nation. There are cashiers, 3,000 local, 550,000 nation. There are assemblers, 650 local, 149,000 nation.

Q   Okay. Is your testimony consistent with the DOT?

A   Yes, it is, Your Honor.

ALJ   Okay. I don't have any other questions of Mr. Mahler. Ms. Leffel?

ATTY        Yes, Your Honor.  If I were to assume this individual had seizure activity which would take him off task and make him have to exit the workplace and go home to relieve the situation one to five times a month, would such an individual be employable in any of these jobs?

VE          No, he would not be, not in competitive work.  In order to sustain these jobs or any other competitive work you can only miss one day a month.

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred when he determined that Claimant did not meet Listings 11.02 and 11.03.  Also, Claimant maintains that the ALJ erred in giving the Vocational Expert (VE) an incomplete hypothetical.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly followed SSR 87-6 and properly found that Claimant did not meet Listings 11.02 and 11.03.  Also, Commissioner asserts that the hypothetical questions posed to the VE included functional limitations supported by objective medical evidence.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of

showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2. Judicial Review. Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3. Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4. Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. Disability Prior to Expiration of Insured Status- Burden. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6. Social Security - Standard of Review. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to

determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

    7.    Social Security - Scope of Review - Weight Given to Relevant Evidence. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

    8.    Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

    9.    Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.   Discussion

### 1. Listings 11.02 and 11.03

Claimant asserts that the ALJ erred in finding that Claimant did not meet Listings 11.02 and 11.03. Commissioner maintains that the ALJ properly found that Claimant did not meet Listings 11.02 and 11.03.

In regards to meeting Listing 11.02 and 11.03 SSR 87-6 states "[a]dequate documentation as to cooperation with prescribed treatment is vital to the assessment of impairment of seizure disorders. The evidence must reflect the current treatment regimen and information about any recent changes in drug dosage. An allowance on the basis of meeting listing level severity is warranted only when the individual is following a treatment regimen prescribed by his or her treating source and continues to have seizures at the specified frequency." SSR 87-6 explains that "[t]he predominant reasons for low anticonvulsant blood levels is that the individual is not taking the drug as prescribed . . . . When reported blood drug levels are low, therefore, the information obtained from the treating physician should include an explanation as to why the levels are low and the results of any relevant diagnostic studies concerning blood levels. Unless convincing evidence is provided that subtherapeutic blood drug levels are due to abnormal absorption or metabolism, and the prescribed drug dosage is not itself inadequate, the conclusion should follow that the individual is not complying with the treatment regimen."

The ALJ "noted that the record included only one laboratory test, occurring in September 2002, measuring the therapeutic level of Dilantin. The test indicated that the claimant's level of medication was 2.8, well below the recommended range of 10.0 to 20.0 UG/ML." (Tr. 20). As required by SSR 87-6 the ALJ "requested updated laboratory testing and an explanation from the

13

treating physician as to why therapeutic levels have not been met." (Tr. 20). The ALJ held the record open and "received numerous laboratory tests indicating that the claimant has not consistently maintained therapeutic levels of phenytoin (Dilantin) or any other anti-seizure medication as detailed in SSR 87-6, other than, recently, carbamazepine (Tegretol) one time. (Tr. 20). The ALJ did not receive an explanation from the Claimant's treating physician explaining "why therapeutic levels have not been maintained, or could be maintained, or any more recent laboratory testing as requested.". (Tr. 20). Therefore, the ALJ followed SSR 87-6 and properly found that Claimant did not meet Listings 11.02 and 11.03.

## 2. Hypothetical

Claimant maintains that the ALJ failed to discuss the effect of Claimant's post-seizure conditions on Claimant's ability to work. Commissioner counters that the hypothetical questions posed to the Vocation Expert (VE) included Claimant's functional limitations supported by objective medical evidence.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

Dr. Schmitt noted that Claimant reports having two to three seizures a month and "experiences lethargy and dizziness as a port-ictal phenomenon." (Tr. 182). Dr. Schmitt's notes are based on Claimant's allegations and not on objective medical evidence. The ALJ found

14

Claimant to be "not fully credible". Also, nothing else in the record supports the proposition that Claimant would need to miss between one to five days of work per month in order to recover from a seizure. Therefore, Dr. Schmitt is not entitled to controlling weight.

In the alternative, Dr. Schmitt did not even propose that Claimant would have to miss between one to five days of work per month in order to recover from seizures. Dr. Schmitt merely noted that Claimant reported having two to three seizures a month and "experiences lethargy and dizziness as a port-ictal phenomenon." (Tr. 182). Dr. Schmitt did not suggest that Claimant's reported lethargy and dizziness lasts all day long and would require him to go home from work. Claimant's attorney was the only person who suggested those restrictions.

Based on the foregoing the hypothetical questions posed to the VE were based on Claimant's functional limitations as supported by objective medical evidence.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED. The ALJ's decision was based on substantial evidence. The ALJ properly followed SSR 87-6 and properly found that Claimant did not meet Listings 11.02 and 11.03. Also, the hypothetical questions posed to the VE were based on Claimant's functional limitations as supported by objective medical evidence.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be

15

submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: April 28, 2005

/s/ James E. Seibert

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE